UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ANDREANA REED,<br><br>              Plaintiff,<br><br>v.<br><br>KINDERCARE LEARNING CENTERS, LLC, a Delaware limited liability company; and KNOWLEDGE UNIVERSE EDUCATION, LLC, a Delaware limited liability company,<br><br>              Defendants. | CASE NO. C15-5634BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendants KinderCare Learning Centers, LLC and Knowledge Universe Education, LLC's (collectively "KinderCare") motion for summary judgment (Dkt. 24). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion in part and denies it in part for the reasons stated herein.

**I. PROCEDURAL HISTORY**

On September 2, 2015, Plaintiff Andreana Reed ("Reed") filed a complaint against KinderCare asserting disability discrimination, failure to accommodate, and retaliation in

ORDER - 1

violation of the Washington Law Against Discrimination ("WLAD"), RCW Chapter 49.60, and the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, as amended by the Civil Rights Act of 1991; violation of 42 U.S.C. §1983; and wrongful termination in violation of public policy.  Dkt. 1.

On September 14, 2016, the Court granted the parties' stipulation dismissing the § 1983 claims.  Dkt. 23.

On September 15, 2016, KinderCare moved for summary judgment.  Dkt. 24.  On October 3, 2016, Reed responded.  Dkt. 45.  On October 7, 2016, KinderCare replied and moved to strike the declaration of Jezreel Proo, Dkt. 47 ("Proo Dec."), and portions of the deposition of Adrian ClayPoole, Dkt. 46 at 192–254 ("ClayPoole Dep.").  Dkt. 48.  On October 12, 2016, Reed filed a surreply responding to the motion to strike.  Dkt. 54.

## II. FACTUAL BACKGROUND

Andreana Reed was born with a congenital disease called opsismodysplasia, which is a rare form of dwarfism.  Dkt. 46 at 109.[1]  The disease interferes with bone development and is characterized by short and undersized bones, particularly in the hands and feet.  As a consequence of her disease, Reed is only 3'7" tall as a full grown adult, and she is about the same height as a typical toddler.  *Id.* at 108, 245–246.

In part because of her height and her stature, Reed pursued a career in early childhood education.  *Id.* at 107.  She enjoyed working with children and obtained experience working in a daycare center and as a nanny for a set of twins. She applied for

---

[1] ECF pagination.

a position at KinderCare Learning Center in Lakewood, Washington. *Id*. at 206, 207. The acting director was ClayPoole, a very senior long-term employee who had worked in all of the Lakewood classrooms over the years. *Id*. at 195, 197–8. ClayPoole interviewed Reed and introduced her to some children. *Id*. at 207. After the interview, ClayPoole drafted an offer letter dated February 27, 2014, signed it, and sent it to Reed. *Id*. at 212.

Approximately one week after ClayPoole hired Reed, KinderCare assigned a new center director, Jill Ripley. *Id*. at 221. ClayPoole contends that Ripley was "completely shocked" when she saw Reed for the first time and thought it was some sort of a joke. *Id*. at 224–225. ClayPoole also testified that Ripley made other comments such as "I can't believe you are hiring a little person," *Id*. at 225, and "it was a completely bad idea" because Reed "wasn't going to be able to accomplish any of the tasks," *Id*. at 223.

ClayPoole contends that Ripley's regional manager, Tiffany Bliss, also opposed Reed's hiring. ClayPoole testified that Bliss "didn't see how having [Reed at] KinderCare was going to be a benefit." *Id*. at 227. Bliss also warned ClayPoole that the hiring would be "on her" if it didn't work out. *Id*.

Shortly after Reed was hired, KinderCare reassigned ClayPoole to a different center. *Id*. at 202. Then, Reed was removed from the class of three- to five year-old children where Reed felt very solid in her abilities, and made a float teacher. *Id*. at 115. Prior to ClayPoole's departure from the Lakewood center, ClayPoole contends that Ripley wanted to move Reed to the toddler room over ClayPoole's objection. *Id*. at 218. ClayPoole testified that Ripley felt Reed would "be made fun of or not be listened to by

older children because of her disability." *Id*. ClayPoole, however, felt that the toddler room was dangerous because the changing tables and sink were both far above Reed's height, and there were blind spots that made it more difficult to see the children in that room. *Id*. at 219–21. ClayPoole thought that putting Reed in a toddler room "was just straight sabotage" and that "there were so many red flags . . . [Ripley] put her in that room, and [Reed] was going to fail." *Id*. at 228, 236.

Besides being placed in classes that may have made the job more difficult for Reed, she also claims that there were issues with reasonable accommodations for her disability. Reed asserts that she requested a stool to access necessary items, smaller gloves, an alternate place to change children's diapers, and a lockbox for her personal belongings. Regarding the stool, ClayPoole initially allowed Reed to use her own stool, which was light, folded up, and could easily be placed in out-of-the-way locations that Reed could access. *Id*. at 110, 211–212. Approximately six weeks after Reed was hired, Ripley informed Reed "that according to KinderCare regulations it was a danger to use [her stool] and [Reed] couldn't use it anymore." *Id*. at 140. While it is unclear what regulation Ripley was referencing, Ripley testified that she was unaware of KinderCare's requirements if an employee requests a reasonable accommodation. *Id*. at 6. Regardless, Ripley ordered stools from KinderCare's website and delivery was delayed for weeks. *Id*. at 142. When the stools arrived, they were "big and bulky" and Reed could not place the stools out of the way in easily accessible areas. *Id*. at 143. Moreover, the stools would constantly disappear and Reed could not leave her classroom to search for them.

1 *Id*. at 145–146.  Instead, she would have to wait until another teacher arrived or passed by

2 the classroom to ask either for the stool or for a break to find a stool.  *Id*.

3       Regarding the gloves, Reed asserts that she continually asked for gloves that fit

4 her hands.  *Id*. at 148, 150.  Although the lack of properly fitting gloves made everything

5 more difficult and more time consuming, Reed used the oversized gloves to change

6 diapers and serve food.  *Id*. at 151.  At least one time Reed did not wear gloves to change

7 diapers to speed up the process.  *Id*. at 155.  The center manager, Elizabeth Curtin,

8 observed Reed not wearing gloves and verbally reprimanded her.  *Id*. at 155–56.

9       Regarding an alternative changing pad, Reed had to change diapers when she was

10 assigned to the toddler room.  *Id*. at 132.  Reed, however, claims that she could not use

11 the changing table in the classroom because it was too high and deemed unsafe by

12 KinderCare.  Instead, she was told to change diapers on the children's sleeping mat/cot.

13 *Id*. at 132–134.  Doing so resulted in the process taking up to five minutes whereas other

14 teachers could change a diaper in one to two minutes on the higher changing tables.  *Id*.

15 Reed asked Curtin for a specific changing pad that could be placed on the floor, which

16 would reduce the time Reed needed to change a diaper, but, similar to the request for

17 gloves, KinderCare provided no alternative changing pad.

18       Regarding the lockbox for Reed's personal belongings, Reed testified that this was

19 Ripley's idea.  *Id*. at 147.  Once Ripley raised the issue, Reed repeatedly asked for the

20 accommodation.  *Id*.  For reasons more thoroughly explained below, Reed fails to show

21 that a lockbox is necessary to perform the essential functions of the job, and the Court

22 need not recite any other facts regarding this alleged accommodation.

1    After a few months, Reed's relationship with KinderCare and other employees
2 was deteriorating. For example, Curtin believed that Reed was "irritable," "more
3 difficult to work through a solution with" and "frustrated or disgruntled." *Id*. at 84.
4 Coworkers would look at Reed say "why can't you get it yourself" or "you need to get it
5 yourself," when Reed had no stool or something else she needed. *Id*. at 185.

6    On June 24, 2014, Reed was working in the toddler room when a coworker said
7 her name. Reed looked up and saw that a child had opened a cabinet in the classroom,
8 was standing inside the cabinet, and had an ibuprofen bottle in his hand from Reed's
9 purse. *Id*. at 173. While all the teachers store their personal belongings in the same
10 closet, Reed placed her purse on the lower level of the closet that day. Reed stated that
11 she was in a hurry that day and that no stools were available for her to reach the upper
12 shelf of the closet out of reach of the toddlers. *Id*. at 174, 179. Immediately following
13 the incident, Curtin told Reed that she would be "written up" for the incident, with no
14 mention of potential termination. *Id*. at 181. Curtin called Bliss and Ripley and both
15 favored termination. *Id*. at 31, 36, 43. Curtin stated that she made the recommendation
16 of termination and Bliss agreed. *Id*. at 43. On July 7, 2014, KinderCare terminated Reed
17 for the pill bottle incident. Dkt. 25 at 76–77.

### III. DISCUSSION

**A.    Motion to Strike**

KinderCare moves to strike the Proo Dec. and inadmissible testimony of ClayPoole. Dkt. 48 at 2–5. First, KinderCare argues that the Proo Dec. and the ClayPoole Dep. contain inadmissible hearsay, speculation, and legal conclusions. *Id*.

The Court agrees that the documents contain some inadmissible evidence. Although it is unclear, KinderCare appears to imply that the Court should disregard all of this evidence because some of it is inadmissible. For example, KinderCare argues that "ClayPoole's testimony is speculative, uncorroborated, inadmissible opinion that lacks foundation and even conflicts with [Reed's] own admissions. It should be disregarded." *Id*. at 4. The Court declines to exclude all of this evidence and will specifically cite the admissible evidence it relies upon in reaching its conclusions.

Second, KinderCare asserts that Reed failed to timely disclose Proo as a potential witness and, by the time of the reply, had "yet to disclose Proo's current contact information . . . ." Dkt. 48 at 3. Regarding the latter assertion, Reed submitted evidence showing that she has disclosed Proo's telephone number. Dkt. 54. KinderCare's attorney then submitted a declaration declaring that the disclosure had been overlooked and withdrawing the previous assertion. Dkt. 57. The Court accepts the withdrawal and no further action need be taken on this issue.

Regarding the untimely disclosure, KinderCare has failed to show prejudice. Even if the disclosure was untimely, KinderCare has had sufficient time to request an extension of time to contact Proo. In fact, the Court recently granted a stipulated motion for relief from the discovery deadline for other matters, and KinderCare did not raise this issue in that motion. Therefore, the Court denies KinderCare's motion on this issue.

**B.     Summary Judgment**

KinderCare moves for summary judgment on Reed's remaining claims for disability discrimination, failure to accommodate, retaliation, and wrongful discharge in

1  violation of public policy.  Dkt. 24.  Reed does not contest the motion on her claim for

2  wrongful discharge in violation of public policy, Dkt. 42 at 27 n.3, and, therefore, the

3  Court grants KinderCare's motion on that claim.  The Court will address the merits of the

4  remaining claims.

5     **1.     Standard**

6         Summary judgment is proper only if the pleadings, the discovery and disclosure

7  materials on file, and any affidavits show that there is no genuine issue as to any material

8  fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

9  The moving party is entitled to judgment as a matter of law when the nonmoving party

10 fails to make a sufficient showing on an essential element of a claim in the case on which

11 the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

12 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

13 could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

14 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

15 present specific, significant probative evidence, not simply "some metaphysical doubt").

16 *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

17 if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

18 jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

19 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

20 626, 630 (9th Cir. 1987).

21       The determination of the existence of a material fact is often a close question. The

22 Court must consider the substantive evidentiary burden that the nonmoving party must

meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

### 2. Disability Discrimination

Both the ADA and the WLAD prohibit an employer from discriminating "against a qualified individual with a disability because of the disability." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12112(a)); *Grill v. Costco Wholesale Corp.*, 312 F. Supp. 2d 1349, 1354 (W.D. Wash. 2004) ("Washington state courts have noted that state law relating to disability discrimination substantially parallels federal law, and courts should look to interpretations of federal antidiscrimination laws, including the ADA, when applying the WLAD.") Discrimination claims under the ADA are subject to the *McDonnell Douglas* burden-shifting framework. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014).

Under the *McDonnell Douglas* test, Reed must first establish a *prima facie* case of discrimination. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280–81 (9th Cir. 2000). If she succeeds, the burden of production shifts to KinderCare to articulate a legitimate

non-discriminatory reason for its adverse employment action. *Id*. at 1281. It is then Reed's task to demonstrate that there is a material genuine issue of fact whether the employer's purported reason is pretext for discrimination. *Id*.

For the purposes of this motion, KinderCare only disputes a few elements of the applicable test. Regarding Reed's *prima facie* case, KinderCare argues that Reed has failed to submit sufficient evidence on the fourth element of her case, which requires her to establish either "(a) that similarly situated employees outside the protected class were treated more favorably, or (b) that other circumstances surrounding the adverse action give rise to an inference of discrimination." Dkt. 24 at 10 (citing *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006)). Reed counters with evidence establishing other circumstances that give rise to an inference of discrimination. Reed asserts that "[s]he was denied the ability to use a stool and the cabinet where she was directed to store her purse had a lock at the very top that she could not reach" and that "[t]his alone establishes the fourth element of Reed's disability discrimination claim." Dkt. 45 at 18.

The Ninth Circuit has approved the proposition that "conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination." *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1093 (9th Cir. 2007) (quoting *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 152 (2004) (en banc)). Similarly, in *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128 (9th Cir. 2001), the Ninth Circuit stated that "the link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for

performance inadequacies resulting from that disability." *Id*. at 1140.  Although Reed could have left her medication in her car or asked another coworker to place her purse out of reach of the children, the evidence that KinderCare failed to provide a stool in the classroom, taken in the light most favorable to Reed, shows that material questions of fact exist for trial.  A reasonable factfinder could conclude that KinderCare's failure to consistently provide a stool in Reed's classroom led to a performance inadequacy resulting from her disability.  KinderCare has failed to submit evidence of a policy that prevented Reed from using her own stool, which was more convenient and less disruptive, and it fails to adequately explain why the provided stool was consistently unavailable.  Purchasing an accommodation that is never or rarely available is tantamount to failing to provide an accommodation.   Therefore, under Ninth Circuit law, the Court concludes that Reed has, at the very least, established her *prima facie* case.

      KinderCare also disputes whether Reed has submitted sufficient evidence to establish pretext. Dkt. 24 at 12-13.  "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir. 1998)).  "These two approaches are not exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper." *Id*.

In this case, Reed has submitted sufficient evidence to overcome summary judgment. Reed has submitted direct evidence of Bliss's opposition to Reed's hiring. For example, ClayPoole testified that Bliss didn't "see how having [Reed] in KinderCare was going to be a benefit" and hiring Reed "was a joke to [Bliss and Ripley]." Dkt. 46 at 228. ClayPoole also testified that management would "make your life a living hell" when they don't want the employee in a certain position. *Id*. at 234. ClayPoole experienced it on a personal level when she was acting director of the Lakewood center, *id*., and observed it happening to Reed, *id*. at 228. KinderCare contends that this testimony is speculative and inadmissible, Dkt. 48 at 8, but it is direct evidence based on personal experience and observations. KinderCare also contends that Curtin, not Bliss, terminated Reed, *id*. at 7, but Bliss "approved" the decision, Dkt. 26 at 130. Moreover, it is hard to ignore the fact that KinderCare failed to permanently assign a stool to Reed's classroom, or at least make one easily obtainable on a daily basis. For such a simple and inexpensive accommodation, a reasonable factfinder could easily conclude when viewing the evidence in the light most favorable to Reed that management was simply waiting for one mistake to terminate Reed. Although KinderCare has set forth a legitimate nondiscriminatory reason for the termination, Reed has met her burden to establish pretext under *McDonnell Douglas* and Ninth Circuit precedent. Therefore, the Court denies KinderCare's motion on Reed's disability discrimination claim.

  **3.**  **Failure to Accommodate**

In this case, Reed asserts claims for failure to engage in the interactive process and failure to accommodate. The facts of this case provide an interesting circumstance of

participating in the interactive process, but, once acquired, failing to adequately provide access to the reasonable accommodation.

First, Reed claims that KinderCare failed to engage in the interactive process. The ADA "legislative history makes clear that employers are required to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000), *vacated on other grounds*, 535 U.S. 391 (2002). "Generally, the best way for the employer and employee to determine a reasonable accommodation is through a flexible, interactive process." *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 779 (2011) (citing RCW 49.60.040(7)(d)). "Employers should 'meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome.'" *Barnett*, 228 F.3d at 1115 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999)).

The uncontested evidence shows that KinderCare engaged in an informal, flexible process to assess Reed's needs for reasonable accommodations. For example, KinderCare allowed Reed to use her own stool until KinderCare provided an allegedly approved stool, bought Reed the new, approved stool, and repeatedly searched for smaller gloves. Reed provides no authority for the proposition that KinderCare was legally obligated to go beyond these actions. More importantly, Reed fails to submit evidence that KinderCare or any employee acted in bad faith in obtaining the reasonable

accommodation of a stool.  Regarding the gloves, Reed admits that she would have preferred smaller gloves, but she was not precluded from performing the essential function of the job with regular gloves.  There is no evidence in the record that smaller gloves were even available for KinderCare to purchase or that KinderCare identified a way to obtain smaller gloves and failed to do so.  Therefore, the Court grants KinderCare's motion on the merits of Reed's claims for failure to engage in the interactive process for the stool and the gloves.

Reed also claims that KinderCare should have provided an alternative station to change diapers and a lockbox to secure her personal belongings.  Dkt. 45 at 26.  These claims are without merit because they are both based on her preferences instead of accommodations designed toward the essential functions of the job.  KinderCare allowed Reed to change diapers at locations within her reach.  Regarding the lockbox, Reed fails to show that securing personal items is an essential function of her job.  It is a personal preference to bring dangerous items into the classroom and no reasonable juror would conclude that KinderCare had to engage in an interactive process to accommodate this desire.  Therefore, the Court grants KinderCare's motion on Reed's failure to engage claims.

Second, Reed's failure to accommodate claim is similar to Reed's disability discrimination claim.  "Often the two claims, are, from a practical standpoint, the same.  For the consequence of the failure to accommodate is, as here, frequently an unlawful termination."  *Humphrey*, 239 F.3d at 1139.  To establish a prima facie case for failure to accommodate under the ADA, Reed must show that "(1) [s]he is disabled within the

meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of [her] disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (quoting *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003)).

Viewing the evidence in the light most favorable to Reed, a reasonable factfinder could conclude that Reed "suffered an adverse employment action because of [her] disability." *Samper*, 675 F.3d at 1237. While Reed definitely decided where to put her belongings on that day, KinderCare fails to adequately explain why Reed did not have access to a stool in her classroom. KinderCare argues that Reed "rarely needed a stool," but KinderCare bought the stool as a reasonable accommodation. It is not an accommodation if it is not available for the individual when needed. There is no authority for the proposition that an employer can engage in an interactive process, secure an accommodation, and then either restrict access or preclude access to that accommodation. In fact, it makes no sense why Reed did not have easy access to a stool. At the very least, the evidence in the record creates material questions of fact for trial. Accordingly, the Court denies KinderCare's motion on Reed's failure to accommodate claim.

  **4. Retaliation**

A *prima facie* case of retaliation under the ADA or the WLAD requires a showing that (1) plaintiff engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the two. *Pardi v. Kaiser Found. Hosp.*,

1  389 F.3d 840, 849 (9th Cir.2004); *Burchfiel v. Boeing Corp.*, 149 Wn. App. 468, 482,

2  205 P.3d 145 (2009). Under the ADA, Reed must show but-for causation on the third

3  element. *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472–73

4  (9th Cir. 2015), *cert. denied sub nom. San Diego Unified Sch. Dist. v. T.B.*, 136 S. Ct.

5  1679, 194 L. Ed. 2d 769 (2016). Under the WLAD, Reed must show that retaliation was

6  a substantial factor motivating the adverse employment action, but not necessarily the

7  sole motivation. *Burchfiel*, 149 Wn. App. at 482. Temporal proximity between the

8  protected activity and the adverse employment action is one factor in determining a

9  causal link between the two. *Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 862

10 (2000).

11       In this case, Reed's federal and state claims are subject to different levels of

12 causation. Under the ADA, Reed must show but-for causation. Viewing the evidence in

13 the light most favorable to Reed, a reasonable juror could conclude that KinderCare

14 retaliated against Reed because of her disability. It is not unreasonable to conclude that

15 the action of termination, as opposed to another type of adverse employment action, was

16 in retaliation for her disability and repeated demands for accommodations. Although

17 KinderCare has met its burden to establish a legitimate nondiscriminatory reason for the

18 termination, Reed has submitted sufficient evidence of pretext. Accordingly, the Court

19 denies KinderCare's motion on Reed's ADA retaliation claim.

20       On the other hand, Reed has submitted sufficient evidence to create material

21 questions of fact on her WLAD retaliation claim. She engaged in the protected activity

22 of requesting reasonable accommodations, she was terminated within a short time period

thereafter, and a reasonable juror could conclude that her disability and request for accommodations were substantial factors in the decision to terminate her. Although KinderCare has met its burden to establish a legitimate nondiscriminatory reason for the termination, Reed has submitted sufficient evidence of pretext. Therefore, the Court denies KinderCare's motion on Reed's WLAD retaliation claim.

## IV. ORDER

Therefore, it is hereby **ORDERED** that KinderCare's motion for summary judgment (Dkt. 24) is **GRANTED in part** and **DENIED in part**.

Dated this 14th day of December, 2016.

BENJAMIN H. SETTLE  
United States District Judge